**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

FILED

00 MAR 15 PH 12: 50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| TONI CASSADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil Action No. CV-97-S-3345-NE |
| | ) |
| FEDERAL EXPRESS | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

MAR 1 5 2000

### MEMORANDUM OPINION

This action is before the court on defendant's motion for
summary judgment (Doc. No. 34), plaintiff's motion to supplement
her evidentiary submission in opposition to summary judgment (Doc.
No. 47), and plaintiff's motion to strike defendant's reply brief
(Doc. No. 54). Plaintiff's motion to supplement is due to be
granted, and her motion to strike is due to be denied. Upon
consideration of defendant's motion for summary judgment, the
briefs, evidentiary submissions, and pleadings, this court
concludes it is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant
part, that summary judgment not only is proper, but "shall be
rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case.  *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor.  *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Inferences in favor

2

of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff, Toni Cassady, began employment with defendant, Federal Express Corporation, in August of 1991 in Huntsville, Alabama. She worked part-time as a customer service agent until December of 1991, at which point she acquired full-time status. Two years later, Cassady bid on, and was awarded, a "floating" swing route driver position. She was responsible for picking up and delivering packages on various routes when regular drivers were absent.

Cassady became pregnant in July or August of 1995.[1]  On December 20, 1995, Cassady fell off the rear bumper of her delivery van while unloading a 125-pound package. Cassady missed three days from work to recover from the fall.  Cassady worked for approximately one more month, and then decided to take a medical leave of absence to prepare for delivery of her child.  Federal Express' leave of absence policy provided, in relevant part, that

---

[1] Before then, she had been plagued by numerous failed pregnancies.

4

> [w]e will hold a position open for you for at least 90
> calendar days. If you are not able to return to work
> within 90 days we may need to replace you in order to
> maintain service to our customers. If we do replace you
> and you are released to return to full duty, you will be
> placed in an open position within your current division,
> although we cannot guarantee that it will be the same
> classification, shift or work location.[2]

Federal Express also had to meet its obligations under the Family

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. The FMLA

guarantees plaintiff up to twelve weeks (84 days) of leave from

work for the birth of a child. Id. § 2612(a). Cassady understood

that Federal Express' own leave of absence policy ran concurrently

with rights granted to her under the FMLA. In other words, she

recognized that the only way to preserve her swing route driver

position was be to return to work within 90 days. She signed a

FMLA Eligibility and Notice form on February 20, 1996,

acknowledging that she took leave on January 25, 1996.

Cassady had numerous discussions with her supervisor, Chuck

Wells, and the Senior Manager of Federal Express' Huntsville

station, Pat Mateer, on the issue of her job security prior to and

just after taking extended leave. Wells and Mateer allegedly

stated that Cassady would retain the swing route driver position

even if she took more than 90 days of leave. Mateer, now deceased,

---

[2] Exhibit 4 to deposition of Toni Cassady, attached as part of defendant's
evidentiary submission in support of summary judgment (Doc. No. 34).

5

allegedly told Cassady that Federal Express' leave of absence
policy had never been uniformly applied at the Huntsville station,
and that it was within his discretion whether to relieve an
employee after 90 days of leave had been expended. Cassady thus
opted not to pursue certain part-time employment opportunities with
Federal Express for the remainder of her pregnancy.

Cassady contacted Wells weekly to apprise him of her health
status after taking leave. She received a letter from Wells on
April 29, 1996, which stated Federal Express' recognition that
Cassady had "been on a Medical Leave of Absence in excess of 90
days and that [she was] not expected to be released to full duty in
the near future."[3] Wells' letter referred Cassady to additional
portions of Federal Express' leave of absence policy, including the
following:

> Positions for employees on medical leave remain available
> for a minimum of 90 days. At the end of 90 days, the
> employee's manager makes a determination based on
> departmental operating requirements to either replace the
> employee on leave or allow the position to remain
> unfilled. If a decision is made to fill the position,
> the manager must notify the employee in writing of the
> manager's intention to fill the position. Under no
> circumstances should this be done earlier than the 91st
> day. [4]

According to Cassady, Wells told her that issuance of the letter

---

[3] Exhibit 9 to Cassady deposition, at unnumbered page 1.

[4] *Id.* at unnumbered page 3.

6

was a formality, and that her position would not be filled by someone else.

Meanwhile, the Huntsville station had undergone an internal change of management in January of 1996. Federal Express stations throughout the country are organized by district. Until January of 1996, the Huntsville station was located in the River District. After that time, however, it was a part of the Delta District.

On May 9, 1996, Cassady received a letter from Susan Baker, the Delta District Leave of Absence Manager. In the letter, Baker notified Cassady that she had "assumed responsibility for the Huntsville station," and that Cassady should keep Baker, not Wells, directly informed of her medical status from that point forward.[5] After receiving the letter, Cassady contacted Baker to relate the discussions she had been having with Mateer and Wells relating to job security. Baker responded by noting the Huntsville station's inconsistent application of the leave of absence policy. She then "informed plaintiff that FedEx's leave policies were applied as written and were not subject to potentially inconsistent applications by different managers within the Delta District."[6]

Cassady subsequently contacted Mateer to discuss the "mixed

---

[5] Affidavit of Susan Baker Campbell, attached as Exhibit A to defendant's supplement to motion for summary judgment (Doc. No. 36), at ¶ 2.

[6] Id. ¶ 3.

7

signals" she was receiving from him and Baker.    Mateer again

reassured Cassady that her position would remain available despite

the fact that her leave had exceeded 90 days.

> Well, I questioned Pat a number of times.  At this
> point, I'm scared to death.  I know what she [Baker] is
> saying, and I know what I have been told for six months.
> And that's what I questioned Pat on every week that we
> talked.
>
> And he continued to assure me that irregardless
> [sic] of that, the Huntsville station had always done it
> this way.  Those [policies] mainly apply to the larger
> stations where they had to fill the routes because the
> business was -- the volume was so much greater than
> Huntsville.  So, Pat continued each week I talked to him
> to repeat what he had said the whole time.[7]

Cassady contacted Mateer and Wells again on June 1, 1996.    They

informed Cassady that, even though her swing route driver position

had been filled, she should not worry, because they had earmarked

a similar position for her upon return from leave.    Cassady then

contacted Baker to relay the gist of her conversation with Mateer

and Wells.    Baker refuted their assertions, and informed Cassady

that she would have four options upon return from leave:   (1)

Cassady could accept a full-time courier position in Memphis,

Tennessee, also located in the Delta District;  (2) she could accept

a part-time courier position at the Huntsville station;  (3) she

could take an additional, unpaid 90 day leave of absence and bid

---

[7] Cassady deposition at 168.

8

for an unlimited amount of positions with Federal Express during this time; or (4) she could resign. Baker further informed Cassady that she would have the "right of first refusal" of any available job if she took the part-time courier position in Huntsville or the unpaid leave of absence.

Baker reiterated Cassady's options in a letter dated July 2, 1996, but withdrew the "right of first refusal" option. Between the time she spoke with Cassady on the telephone and composed the letter, Baker had consulted with Federal Express' legal department, which indicated that such a right was not available. Cassady discussed the four options with Mateer, who advised her to take the part-time job at the Huntsville station and file an internal grievance, known as a Guaranteed Fair Treatment ("GFT") complaint. The GFT process permits a Federal Express employee to challenge a personnel decision he or she believes is unfair. Cassady followed Mateer's advice.

Cassady participated in a telephone conference with Baker, Mateer, Jeff Walker (Delta District Director), Jeff Bartusch (Delta District Personnel Representative), and Lane Williford (Delta District Operations Manager) regarding her GFT complaint on July 19, 1996. Based on that conference, Walker concluded that Baker had properly applied the leave of absence policy. Walker further

9

remarked:

> I understand your concerns that there have been instances
> wherein policy has not previously been applied in a
> consistent manner. However, we are making every effort
> within the company and the Delta District to insure that
> we apply Policy consistently per the guidelines of the
> Federal Express Policy and Procedures .... [8]

Cassady appealed Walker's decision to Scott Bunker, Vice President

of Federal Express' Southern Region.   He sustained Walker's

decision, saying:

> Your GFTP complaint indicates you are aware of other
> employees who have been treated differently than you when
> they were faced with other similar circumstances.   You
> were contacted by my office and asked to identify the
> employees you were referring to.     During this
> conversation you admitted each of the employees you were
> referring to returned to work 14 to 18 months ago.
> During the time from their return to work to the date of
> your return to work[,] policies and practices have been
> clarified and/or modified which require management to
> handle your return to work as they did.  Management has
> not violated any policy and was correct in the actions
> taken. [9]

Federal Express' Appeals Board later upheld the decisions of Walker

and Bunker, thereby concluding the internal investigation into

Cassady's GFT complaint.

   After failing to win back her swing route driver position,

Cassady continued her employment as a part-time courier.  Cassady

claims that Mateer attempted to place her in a newly-created, full-

---

[8] Exhibit 15 to Cassady deposition, at unnumbered page 1.

[9] Exhibit 17 to Cassady deposition, at unnumbered page 1.

10

time position. Federal Express, however, awarded that position to someone else. Cassady resigned from her part-time position in early October of 1996.

Cassady then filed a charge of discrimination with the EEOC, claiming that Federal Express discriminated against her on the basis of sex.[10]

> I feel the action taken in my case is discrimination because as I stated above, other employee[']s cases were treated quite differently than mine and according to corporate, this policy has always been in place, revised however, in March of 1996, and was only enforced correctly because a number of women employees had reached their child bearing years and it had become a problem trying to fill their positions until they returned, thus, my case would "set a precedent" to other female employees that there would be consequences if your stay extended longer than 90 days. ... Federal Express offers no alternatives to women in their child bearing years and that is truly the discriminatory part of this entire situation. Any obstetrician will tell you that a woman in her middle trimester can not safely lift 75 pounds unassisted which became obvious to me when I fell.[11]

The EEOC eventually issued Cassady a notice of her right to institute this action.

### III. DISCUSSION

Cassady commenced the present action on December 29, 1997. She asserted claims under Title VII of the Civil Rights Act of 1964

---

[10] It is important to note that Cassady checked only the "Sex" box in her EEOC charge. Significantly, she left the "Retaliation" box unchecked. *See infra* pages 16-17.

[11] Exhibit 22 to Cassady deposition, at unnumbered page 4.

11

("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et *seq.*, and state law. More specifically, Cassady argued Federal Express violated Title VII by discriminating against her on the basis of sex.[12]  She contended that Federal Express violated her FMLA rights by not only "interfering with, restraining, or denying the exercise of a right provided under the [FMLA]," but also "retaliating and discriminating against her for opposing the violation of her rights under the FMLA."[13]  Finally, Cassady brought state law claims of breach of implied contract and breach of express promise, which were based on Federal Express' failure to return her to the swing route driver position.[14]

Federal Express moved for summary judgment on all claims on April 1, 1999, and amended that motion on April 19, 1999.  It contended dismissal of Cassady's claim was proper, because

> 1.    Plaintiff cannot establish a *prima facie* case of discrimination or retaliation under the FMLA, nor can she demonstrate that she was entitled to FMLA protection;

> 2.    Plaintiff cannot establish a *prima facie* case of sex or pregnancy discrimination, nor can she demonstrate that defendant's legitimate, non-discriminatory reasons for its decision are pretextual;

---

[12] Complaint (Doc. No. 1) ¶ 25.

[13] *Id.* ¶ 26.

[14] *Id.* ¶¶ 27-28.

12

[and]

. . .

4.    Plaintiff cannot establish the existence of any
contract to support her breach of contract claims.[15]

Additionally, Federal Express asserted that Cassady had not adduced

sufficient evidence to state a claim for disparate impact under

Title VII, if such a claim could be gleaned from the text of her

complaint.[16]

In her brief in opposition to summary judgment, Cassady

contested Federal Express' assertions with respect to her Title VII

disparate treatment and disparate impact claims, as well as her

state law breach of implied contract and breach of express promise

claims.  She also asserted that a Title VII retaliation claim was

properly before this court.  She failed to argue, however, that

summary judgment was inappropriate on her FMLA claims.  The court

addresses the propriety of plaintiff's claims under FMLA and state

law, before proceeding to a discussion of Title VII issues.

---

[15] Defendant's amended and substituted brief in support of motion for
summary judgment (Doc. No. 42), at 2.  Federal Express also contended that
Cassady could not establish a claim for constructive discharge.  This court
interprets Cassady's complaint as not stating an independent claim for
constructive discharge.  Rather, statements to that effect are best construed in
the context of Cassady's Title VII claims, discussed *infra*.  Moreover, Cassady's
lack of response to Federal Express' constructive discharge arguments confirms
that those allegations did not form an independent claim within her complaint.

[16] *Id.* at 38-39.

13

## A.  FMLA

Cassady's lack of response regarding her FMLA claims not only
is telling, but also appropriate.  For the reasons advanced by
Federal Express at pages 18-25 of its amended and substituted brief
in support of summary judgment, Cassady's FMLA claims are due to be
dismissed.

## B.  State Law Claims

Cassady implicitly contends that representations made to her
by Wells and Mateer contractually obligated Federal Express to
return her to the swing route driver position, regardless of the
written terms of the company's leave of absence policy.  Federal
Express refers the court to an employee handbook issuance receipt
and a disclaimer on Cassady's employment application and agreement
for the proposition that Mateer and Wells had no authority to make
such promises to plaintiff.  The issuance receipt provides, in
relevant part:

> The Company wants you to understand that *The Federal
> Express Employee Handbook* should not be considered a
> contract of employment, nor should *The Federal Express
> Employee Handbook*'s provisions be read or implied to
> provide for one. ... I further understand that no manager
> or representative of the Company, other than the CEO or
> a senior vice president designated by the CEO, has any
> authority to enter into an agreement of employment with
> me for any specified period of time. [17]

---

[17] Exhibit 1 to Cassady deposition, at unnumbered page 2.

14

The employment application and agreement provides, in relevant

part:

> That during the term of my employment, which term I
> understand is indefinite, I will comply with the
> guidelines set forth in the Company's policies, rules,
> regulations, and procedures, which I understand shall be
> amended from time to time.  I ALSO AGREE THAT MY
> EMPLOYMENT AND COMPENSATION CAN BE TERMINATED WITH OR
> WITHOUT CAUSE AND WITHOUT NOTICE OR LIABILITY WHATSOEVER,
> AT ANY TIME, AT THE OPTION OF EITHER THE COMPANY OR
> MYSELF.   I further understand that no manager or
> representative of the Company, other than the CEO, COO,
> or other senior vice-president designated by the CEO, has
> any authority to enter into any agreement for employment
> with me for any specified period of time or to amend this
> agreement in any manner. [18]

Cassady signed, and acknowledged legal responsibility for, both of

the above documents.  While Cassady could not recall specifically

reading the above provisions, she admitted in deposition that she

had the opportunity to do so.

These provisions clearly indicate that Mateer and Wells had no

authority to unilaterally modify Cassady's at-will employment

relationship with Federal Express.  In order to prove under the

substantive law of the State of Alabama that an employment contract

is not terminable at will, plaintiff must show:

> (1) that there was a clear and unequivocal offer of
> lifetime employment or employment of definite duration,
> (2) <u>that the hiring agent had authority to bind the</u>

---

18 Exhibit 2 to Cassady deposition, at numbered page 11 (emphasis in
original).

15

> principal to a permanent employment contract [or a
> contract for a definite duration], and (3) that the
> employee provided substantial consideration for the
> contract separate from the services to be rendered.

*Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987)

(emphasis supplied) (citations omitted).   The fact that the

Huntsville station had not uniformly applied its leave of absence

policy is irrelevant to the question of whether Mateer or Wells

possessed the authority to guarantee employment for Cassady.

Because those two individuals lacked such authority, Cassady's

state law claims are due to be dismissed.

**C.   Title VII**

    In either her complaint or brief in opposition to summary

judgment, Cassady premises Federal Express' liability under Title

VII on three different grounds:  retaliation; disparate impact; and

disparate treatment.   The court addresses these bases in turn.

**1.   Retaliation**

    A specific claim of unlawful retaliation under Title VII first

surfaces in Cassady's brief in opposition to summary judgment.

Cassady argues that Federal Express engaged in retaliatory conduct

by choosing another individual for the full-time position in the

Huntsville station after she had participated in the GFT process.

No allegations to that effect are present in her EEOC charge of

16

discrimination or judicial complaint. Significantly, Cassady

failed to check the "Retaliation" box in her EEOC charge.

Accordingly, this court concludes that, because Cassady did not

attempt to state a claim of retaliation in violation of Title VII[19]

either in her pleadings before the administrative agency or this

court, allegations to that effect are due to be dismissed. *See*

*Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999).

### 2.   Disparate impact

42 U.S.C. § 2000e-2(a)(1)-(2) provides:

It shall be an unlawful employment practice for an
employer—

> (1) to fail or refuse to hire or to discharge any
> individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national
> origin; or

> (2) to limit, segregate, or classify his employees
> or applicants for employment in any way which would
> deprive or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status as
> an employee, because of such individual's race, color,
> religion, sex or national origin.

---

[19] Given their similar elements, the fact that Cassady stated a claim of
retaliation under the FMLA in her complaint (but failed to pursue that claim in
brief) runs counter to any argument that this court should entertain a Title VII
retaliation claim. *Cf. Pudenz v. Littlefuse, Inc.*, 177 F.3d 1204, 1209 (11th
Cir. 1999) (subscribing to the Latin maxim "*expressio unius est alterio
exclusius*," which "stands for the proposition that the mention of one thing
implies the exclusion of the other").

In 1978, Congress passed the Pregnancy Discrimination Act, which amended Title VII to include discrimination on the basis of pregnancy, childbirth, or related medical conditions within the ambit of the term "sex." *See* 42 U.S.C. § 2000e(k).

Courts construing 42 U.S.C. § 2000e-2(a) recognize two different types of discrimination: disparate treatment and disparate impact. Disparate treatment is discussed *infra* at Section III.C.3. The Supreme Court articulated the theory behind disparate impact discrimination in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> [Claims of disparate impact] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate impact theory.

*Id.* at 335-36 n.15, 97 S.Ct. at 1854-55 n.15. "To establish a *prima facie* case of disparate impact, a plaintiff must first identify the specific employment practice that allegedly has a disproportionate impact. Next, the plaintiff must establish causation by offering statistical evidence to show that the practice in question has resulted in prohibited discrimination." *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1314 (11th Cir.

18

1994) (citation omitted). Should plaintiff establish a *prima facie* of disparate impact, "the employer can then respond with evidence that the challenged practice is both related to the position in question and consistent with business necessity." *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1314 (11th Cir. 1999).

Here, Cassady has satisfied the first element of her *prima facie* case. She has pinpointed Federal Express' leave of absence policy as an employment practice that allegedly impacts pregnant employees in a disparate manner. Plaintiff's disparate impact claim fails, however, in light of the second requirement for establishment of a *prima facie* case. Upon consideration of the evidentiary submissions, this court concludes that Cassady has failed to proffer competent evidence indicating that Federal Express' leave of absence policy disproportionately impacts pregnant employees. *See Spivey*, 196 F.3d at 1314; *Flowers*, 33 F.3d at 1315. Accordingly, Cassady's disparate impact claim is due to be dismissed.

### 3. Disparate treatment

The Supreme Court also articulated the theory behind a claim of disparate treatment in its decision in *International Brotherhood*:

19

> The employer simply treats some people less favorably
> than others because of their race, color, religion, sex,
> or national origin.  Proof of discriminatory motive is
> critical, although it can in some situations be inferred
> from the mere fact of differences in treatment.
> Undoubtedly disparate treatment was the most obvious evil
> Congress had in mind when it enacted Title VII.

431 U.S. at 335-36 n.15, 97 S.Ct. at 1854-55 n.15.  A plaintiff may

establish a case of disparate treatment through either direct

evidence or circumstantial evidence.  Only the most blatant remarks

harboring discriminatory intent constitute direct evidence.  *See*

*generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d

1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187

F.3d 1287, 1293-1303 (11th Cir. 1999).  Cassady produced no direct

evidence of disparate treatment.

Accordingly, this court must analyze her circumstantial

evidence of sex discrimination under the burden-shifting framework

originally articulated by the Supreme Court in *McDonnell Douglas*

*Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973).  Under that tripartite scheme, the plaintiff has the

initial burden of establishing a *prima facie* case of

discrimination.  If successful, the burden of production shifts to

the defendant, who must articulate a legitimate, nondiscriminatory

reason for the challenged employment action.  If that burden is

20

met, the plaintiff must produce evidence indicating that the defendant's stated reason is mere pretext for unlawful discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff carries the ultimate burden of persuasion of showing that the defendant intentionally discriminated against her. *See Wright*, 187 F.3d at 1292 ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.")

To establish a *prima facie* case of sex discrimination, plaintiff must satisfy four requirements. Cassady must show that: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position or benefit sought; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules [on account

21

of her pregnancy]. *See Spivey,* 196 F.3d at 1312. It is not
contested that Cassady meets the first three elements of her *prima
facie* case. Further, this court finds plaintiff has adduced
sufficient evidence at this point in the proceedings to establish
that she suffered from a differential application of work rules.
*See Byrd v. Lakeshore Hospital,* 30 F.3d 1380, 1383-84 (11th Cir.
1994) (noting that "it is a violation of the PDA for an employer to
deny a pregnant employee the benefits commonly afforded temporarily
disabled workers in similar positions, or to discharge a pregnant
employee for using those benefits"). Specifically, she has
produced evidence indicating that David McLaurey, another Federal
Express employee who took medical leave in excess of 90 days around
the time Cassady took leave, received a "right of first refusal" as
part of his four employment options.[20] Cassady was not given such
a right. *See supra* page 9. Also, viewing the facts in a light
most favorable to Cassady, she has made a showing of differential
application based on the fact that the Huntsville station generally

---

[20] More specifically, McLaurey was offered the following four employment
options upon his return from medical leave in February of 1996: (1) a full-time
position at one of the Federal Express stations located in Nashville, Tennessee;
(2) a full-time position at a different Federal Express station in Nashville; (3)
a full-time position at a Federal Express station in Bowling Green, Kentucky; and
(4) personal leave with the right to bid on an unlimited number of positions as
they became available, along with a "right of first refusal" with respect to the
first position on which he bid. Baker affidavit ¶ 10.

22

had applied the leave of absence policy inconsistently.

Defendant effectively rebuts Cassady's *prima facie* case with two legitimate, non-discriminatory reasons. First, Federal Express revoked its provision for a "right of first refusal" between the time McLaurey returned from medical leave (February of 1996) and the time Cassady returned from medical leave (July of 1996). Baker in fact questioned Federal Express' legal department on this very issue during her discussions with Cassady. Further, Baker stated in affidavit that another Federal Express employee, John D. Barber, who was on medical leave for more than 90 days at approximately the same time Cassady was on leave, did not receive a "right of first refusal" as part of his employment options.

> For example, John D. Barber was on leave at roughly the same time as Ms. Cassady. After being out of work more than ninety days, and when he was finally released to full duty with no restrictions, Mr. Barber was offered a full-time courier position in Columbia, Tennessee, part-time courier positions at [other Delta District] stations, a leave of absence, or voluntary resignation. Under the leave of absence, Mr. Barber was specifically told that "you will not receive any preferential treatment during the selection process." [21]

It is well-established that the Pregnancy Discrimination Act "does not require that employers give preferential treatment to pregnant employees." *Spivey,* 196 F.3d at 1312. As stated by the Third

---

[21] Original affidavit of Susan Baker Campbell, attached as part of defendant's evidentiary submission in support of summary judgment, at ¶ 11.

23

Circuit in *In re Carnegie Center Associates*, 129 F.3d 290 (3d Cir.
1997), "the PDA is a shield against discrimination, not a sword in
the hands of a pregnant employee." *Id.* at 297, *cert. denied*, ___
U.S. ___, 118 S.Ct. 2342 (1998).

Second, the transfer of the Huntsville station from the River
District to the Delta District resulted in a change of management.
The evidence indicates that Walker, as Delta District Director, and
Baker, as Leave of Absence Manager, were committed to consistent,
uniform application of Federal Express' leave of absence policy to
employees working in Huntsville. There is no question that Federal
Express properly followed its written policy in dealing with
Cassady, or that Federal Express utilized Cassady's situation to
set a precedent.

Cassady argues that reason is pretextual, however, based on
the fact that the company's written policy had not been followed
consistently at the Huntsville station in the past. Even so,
plaintiff still has failed to meet her burden of showing that
Federal Express' decision to follow policy in this instance was
somehow related to her pregnancy. Cassady's deposition testimony
on this point is telling:

> Q. Is there anything about any of the discussions
> leading up to the GFT that would lead you to believe or

24

support an allegation that Mr. Walker's decision
upholding Ms. Baker's decision was based on sex, your sex
as a female?

A.   No.

Q.   Okay.  Do you have any information that would
lead you to believe that Ms. Baker based her decision to
apply the policy as written based on your sex?

A.   No. [22]

Federal courts "are not in the business of adjudging whether
employment decisions are prudent or fair." *Damon*, 196 F.3d at
1361.   Rather, their "sole concern is whether unlawful
discriminatory animus motivates a challenged employment decision."
*Id.*   As stated by the Fourth Circuit in *EEOC v. Clay Printing
Company*, 955 F.2d 936, 946 (4th Cir. 1992):

> It is not for this court or any other governmental agency
> to direct the business practices of any company.  In the
> context of this case, Clay was free to make its business
> decisions, including reorganizing its work force, so long
> as it did not violate the [PDA].  It is not the purpose
> of the EEOC nor the function of this court to second
> guess the wisdom of business decisions.

*Id.* at 946.   *Accord Carter v. City of Miami*, 870 F.2d 578, 585
(11th Cir. 1989) ("Conclusory allegations of discrimination,
without more, are not sufficient to raise an inference of pretext
or intentional discrimination where [an employer] has offered ...

---

[22] Cassady deposition at 236-37.

25

extensive evidence of legitimate, non-discriminatory reasons for its action.").

Simply put, plaintiff has adduced no evidence that creates a genuine issue of fact regarding the truth of Federal Express' non-discriminatory reasons.  A jury could not reasonably conclude that Federal Express was motivated by any reason other than its stated rationale — the consistent and uniform application of its leave of absence policy at all stations within the Delta District — for opting to displace Cassady from her swing route driver position after more than 90 days of medical leave.  Because she has failed to meet her burden of showing that Federal Express' legitimate, non-discriminatory reasons were pretextual, Cassady's disparate treatment claim also is due to be dismissed.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _15th_ day of March, 2000.

United States District Judge

26